STATE OF RHODE ISLAND
PROVIDENCE, S.C.

SUPERIOR COURT

ANDCO, INC. d/b/a ANDERSON MOTORS,
Plaintiff,

VS.

P.C. No.: 07-2332

WORKHORSE CUSTOM CHASSIS, LLC and
WORKHORSE SALES CORP.,
Defendants.

**VERIFIED COMPLAINT**

1. Plaintiff, ANDCO, Inc. d/b/a Anderson Motors ("ANDCO"), is a Rhode Island corporation which serves as a licensed Rhode Island franchised automobile dealer for Workhorse brand trucks, whose shareholders are John Anderson, Sr., and Judith Anderson.

2. Defendant, Workhorse Custom Chassis, LLC ("Workhorse") is a Rhode Island licensed truck manufacturer who serves as the franchisor for certain Workhorse brand trucks (see Rhode Island Manufacturer's License Application from Workhorse dated December 2006 attached hereto as Exhibit A hereto).

3. The "Dealer Principal" of ANDCO under the relevant franchise agreement (the "Dealer Agreement") between Workhorse and ANDCO is John Anderson, Sr.

4. Defendant Workhorse Sales Corp. ("Workhorse Sales") is a separate Rhode Island licensed truck manufacturer who serves as the franchisor for certain Workhorse brand trucks (see Rhode Island Manufacturer's license

application from Workhorse Sales dated December 2006 attached as Exhibit B hereto).

5. ANDCO is listed by both Workhorse and Workhorse Sales as the franchised Rhode Island dealer for products of both of said manufacturers in the applications filed in December 2006 with the State of Rhode Island Division of Motor Vehicles (see Exhibits A and B above).

6. Workhorse Sales is registered with the Rhode Island Secretary of State's office to do business in Rhode Island (see Exhibit C attached), but upon information and belief, Workhorse is not registered with the Rhode Island Secretary of State's office to do business in Rhode Island.

7. For many years, ANDCO has served without incident as a licensed Rhode Island franchised automobile dealer for Workhorse brand trucks.

8. In the beginning of February 2007, ANDCO received a termination notice letter (the "Termination Notice") from Bill Beach, Director of Dealer Operations for Workhorse, purporting to terminate ANDCO's Workhorse truck franchise as of May 5, 2007, based on an alleged violation by ANDCO of Section 8.4.6 of the Dealer Agreement between ANDCO and Workhorse (a copy of the Termination Notice is attached hereto as Exhibit D).

9. Section 8.4.6 of the Dealer Agreement between ANDCO and Workhorse, states that the dealer agrees not to "…engage in any illegal, deceptive, misleading, or unethical practices".

10. The Termination Notice did not state any alleged factual basis for the alleged violation by ANDCO of Section 8.4.6 of the Dealer Agreement between ANDCO and Workhorse.

11. ANDCO has never received a franchise termination notice from Workhorse Sales, despite ANDCO having executed certain agreements with Workhorse Sales, and despite Workhorse Sales having listed ANDCO as a franchised dealer in Workhorse Sales' December 2006 manufacturer application filed with the State of Rhode Island Division of Motor Vehicles (see <u>Exhibit B</u>).

12. Under Sections 12.3 (entitled "Material Breaches with Right to Cure") and 12.4 (entitled "Breaches Causing Immediate Termination")(both attached hereto as <u>Exhibit E</u>) of the relevant Dealer Agreement between ANDCO and Workhorse, Workhorse may terminate the Dealer Agreement without giving the dealer an opportunity to cure any alleged basis for franchise termination, <u>only</u> upon certain specified events, and for all other events which allegedly serve as a basis for franchise termination, the dealer <u>must</u> be given an opportunity to cure.

13. A breach by a dealer of the dealer's obligations under Section 8.6.4 of the Dealer Agreement is <u>not</u> listed in Section 12.4 of the Dealer Agreement as an event entitling Workhorse to terminate the Dealer Agreement without notice and an opportunity to cure, and thus any termination notice to

ANDCO under Section 8.6.4 must under the clear terms of the Dealer Agreement, allow for an opportunity to cure by ANDCO.

14. ANDCO has never been given notice by Workhorse of an opportunity to cure the alleged basis for the Termination Notice, and ANDCO has never in fact been given by Workhorse an opportunity to cure, both as required by the Dealer Agreement.

15. ANDCO has never been advised of any alleged factual basis for the alleged violation by ANDCO of Section 8.4.6 of the Dealer Agreement between ANDCO and Workhorse, other than a vague verbal telephone call reference by Bill Beach when he was called by John E. Anderson, Jr. as Vice President of ANDCO after receipt of the Termination Notice, to the effect that the alleged franchise agreement violation concerned the business involvement of certain employees of ANDCO in an International/Navistar truck franchise in Massachusetts (the International/Navistar truck franchises, upon information and belief, have the same parent company as Workhorse and Workhorse Sales as described in more detail below). During that telephone call Bill Beach confirmed that the alleged violation did not directly involve ANDCO's operation of the Workhorse franchise.

16. The business involvement in an International/Navistar truck franchise in Massachusetts by certain employees of ANDCO, was in those persons' individual capacities and/or corporate capacities not related to ANDCO,

and ANDCO has never been a party to any agreements related to the relevant International/Navistar truck franchise in Massachusetts.

17. Upon information and belief, Workhorse is attempting to terminate ANDCO's Workhorse truck franchise based on alleged conduct by entities or persons other than ANDCO or its Dealer Principal (John Anderson, Sr.).

18. In fact, the business involvement in an International/Navistar truck franchise in Massachusetts, was primarily by members of the Anderson family other than John Anderson, Sr., who is the "Dealer Principal" under the relevant franchise agreement between Workhorse and ANDCO.

19. The specific conduct engaged in Massachusetts by certain employees of ANDCO in Massachusetts in their individual capacities, would not constitute a violation of the Workhorse franchise agreement even if the conduct was conducted by or was attributable to ANDCO, and certainly not when in fact that conduct was not conducted by and is not attributable to ANDCO. The conduct in Massachusetts in question is summarized in Paragraphs 20 through 22 below and the Affidavit referenced below and attached hereto.

20. International Truck and Engine Corporation ("ITEC") is a manufacturer and distributor of trucks and engines under the trade names "International" and "Navistar".

21. Upon information and belief, ITEC is owned by the same parent company or holding company that owns Workhorse and Workhorse Sales.

22. Certain employees of ANDCO (but not ANDCO itself) have been involved in business dealings with ITEC in a truck dealership in Massachusetts which sells International and Navistar brand trucks (see Affidavit of John E. Anderson, Jr. attached hereto as Exhibit F, which explains in some detail those business dealings in Massachusetts, and which specifically discusses the good faith basis for the deposit of certain funds from the Massachusetts dealership into ANDCO's account and immediately thereafter into an attorney escrow account, which deposit upon information and belief may be the alleged basis for the Termination Notice).

23. ANDCO is aware of no other possible factual basis for an alleged breach by ANDCO of the Workhorse franchise agreement, other than the general factual background outlined above and in Exhibit F, which factual background clearly shows that ANDCO did not engage in any conduct vis-à-vis Workhorse which should serve as a basis for a termination of ANDCO's Workhorse franchise agreement.

24. To the extent the factual basis for the alleged breach by ANDCO of the Workhorse franchise agreement relates to the deposit of the funds from the Massachusetts dealership into an ANDCO account as described in the Affidavit attached hereto as Exhibit F, it is important to note that the deposit in question took place on October 3, 2006, and ITEC was aware of the deposit after being informed about it by John E. Anderson, Jr. on October 4, 2006, some four (4) months prior to the Termination Notice

being sent, and as a related company to ITEC, it is reasonable to assume that Workhorse was aware of the deposit at or about the same time that ITEC was aware of the deposit.

25. The four (4) months delay in Workhorse sending the Termination Notice to ANDCO after Workhorse upon information and belief had full knowledge of the facts that allegedly serve as a basis for the franchise termination, has prejudiced ANDCO, and undercuts the "good faith" of Workhorse's Termination Notice, especially because during said four (4) month period, Workhorse continued to do "business as usual" with ANDCO, and even offered new Workhorse product lines to ANDCO during said four (4) month period.

26. R.I.G.L. 31-5.1-1 et seq. ("The Dealer Protection Law") delineates in great detail the requirements that an automotive manufacturer like Workhorse must meet in order to legally terminate the franchise of a truck dealer like ANDCO.

27. Under R.I.G.L. 31-5.1-4(d), a manufacturer like Workhorse cannot terminate the truck franchise of a dealer like ANDCO, <u>notwithstanding the terms and conditions of the relevant franchise agreement</u>, unless the manufacturer has (quoting the statute):

(i) Satisfied the notice requirement of subdivision (5) of this subsection;
(ii) Has good cause for the cancellation, termination, or non-renewal;
(iii) Has not committed any violations set forth in subsection (b) of this section; and

(iv) Has acted in good faith as defined in this chapter and has complied with all provisions of this chapter.

28. Under R.I.G.L. 31-5.1-4(d)(4), "The manufacturer shall have the burden of proof for showing that the notice requirements have been complied with, that there was good cause for the franchise termination, cancellation, or non-renewal, and that the manufacturer has acted in good faith".

29. Under R.I.G.L. 31-5.1-4(d)(4), any franchise termination shall contain the following:

(A) A statement of intention to terminate, cancel, or not to renew the franchise;
(B) A statement of the reasons for the termination, cancellation, or non-renewal; and
(C) The date on which the termination, cancellation, or non-renewal shall take effect.

30. The Termination from Workhorse to ANDCO does not satisfy the requirements of R.I.G.L. 31-5.1-(d)(4) in that there exists no good cause as required by the Dealer Protection Law for the termination of ANDCO's Workhorse truck franchise.

31. The Termination Notice from Workhorse to ANDCO does not satisfy the requirements of 31-5.1-4(d) in that ANDCO has never been given the reasons for the termination as required by the statute, with Workhorse simply stating in its Termination Notice a vague reference to Section 8.4.6 of the relevant Dealer Agreement, which Section simply lists "illegal, deceptive, misleading, or unethical practices" as something a dealer agrees not to do.

32. Under R.I.G.L. 31-5.1-13 and R.I.G.L. 31-5.1-4(b)(6), inter alia, this Court is empowered to issue an Injunction to protect ANDCO from the unlawful termination of its Workhorse truck franchise by Workhorse, notwithstanding the terms and conditions of the Dealer Agreement (Section 16.11 of the Workhorse "Authorized Dealer Agreement" and Section 3.17 of the Workhorse "Terms of Sale Bulletin No. 99-1A") which purport to mandate that controversies under the Dealer Agreement be determined by binding Arbitration in Indiana, on the basis that the injunctive relief requested is more appropriate for a judicial determination (the Dealer Agreement provides for Workhorse's ability to obtain judicial injunctive relief against ANDCO notwithstanding the arbitration provision), and on the basis that Section 16.10 of the Dealer Agreement specifically allows for applicable State law to supercede the Dealer Agreement.

33. The State law which supercedes the Dealer Agreement includes R.I.G.L. 31-5.1-13, which states that "...any dealer may bring a civil action in the superior court to enjoin further violations, and to recover the actual damages sustained by that person together with the costs of the suit, including a reasonable attorney's fee", and R.I.G.L.31-5.1-4(b)(6), which states that Workhorse may not "...require any controversy between a new motor vehicle dealer and a manufacturer, distributor, or representative to be referred to any person other than the duly constituted courts of this state or

of the United States of America…if that referral would be binding upon the new motor vehicle dealer".

34. ANDCO has unsuccessfully attempted up until the filing of this Complaint to negotiate the withdrawal by Workhorse of the Termination Notice, and ANDCO has only succeeded in negotiating an extension of the effective date of the franchise termination from May 5, 2007, until May 11, 2007.

35. If this Court does not temporarily, preliminary, and permanently restrain and enjoin the termination of ANDCO's Workhorse truck franchise, ANDCO will suffer irreparable harm, and damages that could not possibly be measured, e.g., ANDCO would lose immeasurable sales of Workhorse new trucks, ANCDO would loose immeasurable sales of Workhorse factory parts and accessories, ANDCO would lose immeasurable Workhorse authorized warranty and non-warranty service business, and ANDCO's goodwill and reputation would be irreparably damaged.

36. Under R.I.G.L. 31-5.1-13(b), ANDCO is entitled to reasonable civil damages and attorneys fees for any loss sustained as a result of a violation of the Dealer Protection Law by Workhorse.

WHEREFORE, ANDCO requests that this Court issue the following relief:

A. Determine that ANDCO is still a franchised dealer of Workhorse Sales, since the only alleged franchise termination notice sent to ANDCO was from Workhorse and not Workhorse Sales;

B. Determine that the Termination Notice sent by Workhorse to ANDCO is void on the basis that the franchise termination notice requirements of the Dealer Protection Law have not been satisfied in that ANDCO has never been provided the factual basis for the Termination Notice;

C. Determine that the Termination Notice sent by Workhorse to ANDCO is void on the basis that good cause for franchise termination does not exist as required by the Dealer Protection Law, with Workhorse having the burden by statute to demonstrate that good cause for franchise termination exists;

D. Determine that the Termination Notice sent by Workhorse to ANDCO is void on the basis that Workhorse is not registered to do business in the State of Rhode Island with the Rhode Island Secretary of State's office;

E. Determine that the Termination Notice sent by Workhorse to ANDCO is void on the basis that the facts that allegedly serve as grounds for franchise termination were fully known by Workhorse for four (4) months prior to the Termination Notice, yet Workhorse never notified ANDCO of any concerns regarding those facts during said four (4) month period, and in fact, Workhorse during said four (4) month period conducted "business as usual" with ANDCO;

F. Determine that the Termination Notice sent by Workhorse to ANDCO is void on the basis that ANDCO was not given notice by Workhorse of

an opportunity to cure any alleged basis for franchise termination, and on the basis that ANDCO was not in fact given by Workhorse an opportunity to cure any alleged basis for franchise termination, both as required by the Dealer Agreement;

G. Temporarily, preliminarily, and permanently restrain and enjoin the franchise termination by Workhorse of ANDCO;

H. Award ANDCO appropriate civil damages and other relief as authorized by the Dealer Protection Law; and

I. Award ANDCO its attorneys fees in pursuing this action as authorized by the Dealer Protection Law.

ANDCO, INC. d/b/a ANDERSON MOTORS,
By its attorney,

Joshua Teverow, Esquire (#2132)
Joshua Teverow, Esquire, Ltd.
55 Pine Street
Providence, Rhode Island 02903
401-272-2900 (Phone)
401-331-2656 (Fax)

Dated: May 7, 2007

## VERIFICATION

The undersigned officer of ANDCO, Inc. d/b/a Anderson Motors hereby swears under oath that the allegations in the above Complaint are true and accurate to the best of my knowledge and belief.

John E. Anderson, Jr., Vice President

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

On this 7th day of May, 2007 before me, the undersigned notary public, personally appeared John E. Anderson, Jr., Vice President of ANDCO, Inc. d/b/a Anderson Motors, and acknowledged to me that he signed above voluntarily in his corporate capacity.

Notary Public
Printed name: JOSHUA TEVERow
My commission expires 6/24/09
JOSHUA TEVEROW, ESQ.
NOTARY PUBLIC
MY COMMISSION EXPIRES JUNE 24, 2009

**EXHIBIT A**

2007 RENEWAL

DEALER LICENSE AND REGULATION OFFICE
DATE REC'D
LIC. #

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
RHODE ISLAND DEALERS' LICENSE & REGULATIONS
DIVISION OF MOTOR VEHICLES
100 Main Street
Pawtucket, RI 02860
(401) 721-2685

# APPLICATION FOR LICENSING OF MANUFACTURER/DISTRIBUTOR

FULL NAME OF MANUFACTURER/DISTRIBUTOR: Workhorse Custom Chassis LLC

BUSINESS ADDRESS 922 S State Route 32 Union City, IN 47390

Name of Company Division (s):

RECEIVED DEC 08 2006 RHODE ISLAND MOTOR VEHICLE DEALER LICENSE & REGULATIONS

Are you a Manufacturer ? ✓ Distributor

Are you connected with sales ? To Distributor Only

Are you connected with parts ? Yes

Are you connected with accessories ?

What make of motorized vehicles do you manufacture or distribute ? Workhorse Light & Medium Duty Trucks

Please list all the franchised R.I. Dealers that you hold franchise agreements with: (attach separate sheet if needed) See Attached

SIGNATURE (IN FULL) : [signature]

TITLE : Vice President Commercial Products

Subscribed and Sworn to before me this 7th day of November 2006

[signature] Phyllis Marie Sleight

NOTARY PUBLIC

PHYLLIS MARIE SLEIGHT
NOTARY PUBLIC OAKLAND COUNTY, MI
MY COMMISSION EXPIRES SEPT. 2...

MANUFACTURER LICENSE FEE : $200.00
DISTRIBUTOR LICENSE FEE : $200.00

**EXHIBIT B**

2007 RENEWAL

DEALER'S LICENSE AND REGULATION OFFICE
ISSUED
MONEY VOUCHER
☐ CASH ☒ CHECK ☐ MO

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS
RHODE ISLAND DEALERS' LICENSE & REGULATIONS OFFICE

DIVISION OF MOTOR VEHICLES
100 Main Street
Pawtucket, RI 02860
(401) 721-2685

**APPLICATION FOR LICENSING OF MANUFACTURER, DISTRIBUTOR**

DATE: 12-8-06

FULL NAME OF MANUFACTURER/DISTRIBUTOR: Workhorse Sales Corp

BUSINESS ADDRESS 850 Stephenson Hwy, Suite 510 Troy, MI 48083 TEL NO. 877-...

Name of Company Division (s): ____

Are you a Manufacturer? NO Distributor Yes

Are you connected with sales? Yes

Are you connected with parts? Yes

Are you connected with accessories?
What make of motorized vehicles do you manufacture or distribute? Please See Attached

Anderson Motors, 170 Amaral St. E. Providence, RI 02915
Please list all the franchised R.I. Dealers that you hold franchise agreements with:
(attach separate sheet if needed)

SIGNATURE (IN FULL): [signature]

TITLE: Vice President Commercial Products

Subscribed and Sworn to before me this 7th day of Nove...

[signature]
NOTARY PUBLIC

PHYLLIS MARIE WRIGHT
NOTARY PUBLIC OAKLAND COUNTY
MY COMMISSION EXPIRES SEP 24, 20..

MANUFACTURER LICENSE FEE: $200.00
DISTRIBUTOR LICENSE FEE: $200.00

EXHIBIT C

Home | Administration | Archives & Public Records | Corporations | Elections | Business Development | Civics & Public Information

Corporations Database

# Rhode Island Corporation Search:

Corporation Status: Active

Look In: Corporation Name

Search Terms:

Search Type: Show Records with ALL of the above terms. Click Here for help with Boolean Searches

Submit Reset

---

ANNUAL REPORT AUTO-FILL
Please Select the Year you are filing for:
2005: (View in Browser) OR (Save to PC)

2006: OR

2007: OR
(Note: You Need Adobe Reader Version 7 or above to create an auto-filled annual report, Click Here for the free download)

---

For Frequently Asked Questions regarding our Annual Report Autofill function or PDF's, Click Here

---

# ID# 157461

# Workhorse Sales Corp.

**Purpose:** DISTRIBUTION AND SALE OF TRUCK CHASSIS AND BODIES

**General Information**

**Status:** AC
**Charter:** FBC

**Annual Report Image:**
2005 Image Not Available

**Chapter: TITLE: 7-1.2-1405**
**State: DELAWARE**
**Duration: PERPETUAL**
**File Date: 7 /24 /2006**
**Effective Date:07/24/2006**
**Last Report Date: 02/05/2007**

2006 Image Not Available
2007 Annual
**Help On Viewing Annual Reports**

**Sic Code: --**

**Authorized Shares: 10,000 COMM $0.0001 PAR VALUE**

---

**Business Address**

Workhorse Sales Corp.
4201 WINFIELD ROAD
WARRENVILLE, IL 60555-, USA
(630)753-5000

**Name and Address of the Registered/Resident Agent**

CT CORPORATION SYSTEM
10 WEYBOSSET STREET
PROVIDENCE, RI02903- USA
Agent is active...Registered office is maintained

---

**Primary Officer/Director/Partner/Manager Information**

**Title:** PRESIDENT
THOMAS R CELLITTI
4201 WINFIELD ROAD
WARRENVILLE, IL60555-, USA

**Mailing Information**

N/A

---

Corporations Division
Office of the Secretary of State A. Ralph Mollis
148 West River St.
Providence, RI 02904
corporations@sec.state.ri.us
www.sec.state.ri.us

Business Hours:
M-F 8:30 am to 4:30 pm
Tel. (401) 222-3040
Fax. (401) 222-1309
Director: Maureen Ewing

**EXHIBIT D**

February 1, 2007

Mr. John E. Anderson
Anderson Motors
170 Amaral Street
East Providence, Rhode Island 02915

Re: ***Authorized Dealer Agreement dated May 1, 1999***

Dear Mr. Anderson:

This letter is being sent pursuant to Section12.1 of the Authorized Dealer Agreement and in accordance with Rhode Island Motor Vehicle Act Section 31-5.1-4 (d)(5).

Please be advised that Workhorse Custom Chassis, LLC will not renew the Dealer Agreement as of May 5, 2007. The reason for the non-renewal is violation of Section 8.4.6 of the Dealer Agreement. This termination will take effect on May 7, 2007. We will be in contact with you prior to that date to discuss any termination issues that need to be addressed. In the meantime, please do not hesitate to contact the undersigned if you have any questions.

Sincerely,

**Workhorse Custom Chassis, LLC.**

Bill Beach
Director of Dealer Operations

*104 Saratoga Court*
*Nicholasville, Kentucky 40356*
*Direct: 859-312-7827*
*Fax: 859-887-4210*
*Electronic: bbeach@workhorse.com*

**EXHIBIT E**

## 12. TERM AND TERMINATION

12.1 **Term**. This Agreement shall become effective only upon signature by both parties and the obtaining by each party of any required licenses, and shall remain in effect until it expires on May 5, 2003. This Agreement shall automatically be renewed for successive one year periods thereafter unless Workhorse notifies Dealer at least 90 days prior to the original expiration date or any annual renewal date that this Agreement will not be renewed, or unless this Agreement is sooner terminated as provided in this Section 12.

12.2 **Successor Agreement.** Dealer agrees that, as a condition for any renewal of this Agreement and upon Workhorse's request, Dealer will execute Workhorse's then current Authorized Dealer Agreement. Dealer's failure to execute any such Authorized Dealer Agreement prior to any annual renewal date shall cause the automatic termination of this Agreement as of its anniversary date. Dealer may enter into a successor Authorized Dealer Agreement with Workhorse on expiration only if Workhorse determines that Dealer has fulfilled its obligations under this Agreement.

12.3 **Material Breaches with Right to Cure**. Subject to Section 16.10, Workhorse may terminate this Agreement by written notice to Dealer, effective 60 days from receipt of notice, if Dealer does not cure any of the following material breaches within 30 days of receipt of written notice from Workhorse:

12.3.1 Refusal by Dealer to timely furnish sales, service or financial information and related supporting data, or to permit Workhorse's examination or audit of Dealer's accounts and records.

12.3.2 Failure of Dealer to timely pay its obligations to Workhorse.

12.3.3 Any other material breach of Dealer's obligations under this Agreement not otherwise specifically identified in Section 12.

12.4 **Breaches Causing Immediate Termination**. Subject to Section 16.10, Workhorse may terminate this Agreement by giving Dealer written notice of termination, termination to be effective immediately or on the date specified in the notice, upon the happening of any of the following events:



1382058\V-1 (Form F)

12.4.1 The removal, resignation, withdrawal or elimination from Dealer for any reason of any Dealer Operator or Dealer Owner without Workhorse's prior written approval.

12.4.2 Any attempted or actual sale, transfer or assignment by Dealer of this Agreement or any of the rights granted Dealer hereunder, or any attempted or actual transfer, assignment or delegation by Dealer of any of the responsibilities assumed by it under this Agreement contrary to the terms of this Agreement.

12.4.3 Any change, whether voluntary or involuntary, direct or indirect, in the record or beneficial ownership or voting control of Dealer as set forth in **Appendix B**, unless permitted by Section 10.1.5 or pursuant to Workhorse's written approval.

12.4.4 Any undertaking by Dealer or any of its owners to conduct, either directly or indirectly, any of the Dealership Operations at any unapproved location.

12.4.5 Any sale, transfer, relinquishment or discontinuance of use by Dealer of any of the Dealership premises or other principal assets required in the conduct of the Dealership Operations, without Workhorse's prior written approval.

12.4.6 Any dispute among the owners or management personnel of Dealer which, in Workhorse's opinion, may adversely affect the Dealership Operations or the interests of Dealer or Workhorse.

12.4.7 A finding by a government agency or court of original jurisdiction or a settlement arising from charges that Dealer, or a predecessor of Dealer owned or controlled by the same Person, had committed a misdemeanor or unfair or deceptive business practice which, in Workhorse's opinion, may adversely affect the reputation or interests of Dealer or Workhorse.

12.4.8 Failure of Dealer to comply with the provisions of any laws or regulations relating to the sale or service of Workhorse Products.

12.4.9 Submission by Dealer of false applications or reports, including false orders for Workhorse Products or reports of delivery or transfer of Workhorse Products.

12.4.10 Failure of Dealer to maintain the line of credit required by Section 8.1.3.

12.4.11 Conviction in a court of original jurisdiction of Dealer, or a predecessor of Dealer owned or controlled, directly or indirectly, by one or more of Dealer's Owners, or any Dealer Operator or Dealer Owner, of any felony.

12.4.12 Failure of Dealer to conduct customary sales and service operations during customary business hours for seven consecutive business days.

12.4.13 Any misrepresentation to Workhorse by Dealer or by any Dealer Operator or Dealer Owner in applying for this Agreement, or in identifying the Dealer Operator, of record or beneficial ownership or voting interests of Dealer.

12.4.14 Submission by Dealer of false applications or claims for any payment, credit, discount, or allowance, including false applications in connection with incentive activities, where the false information was submitted to generate a payment to Dealer for a claim which would not otherwise have qualified for payment.

12.5 Automatic Expiration. This Agreement will expire automatically if either: Dealer becomes insolvent or there is a filing by or against Dealer of a petition in bankruptcy, or filing of a proceeding for the appointment of a receiver or trustee for Dealer; or Dealer makes an assignment for the benefit of creditors; or there is any foreclosure or other due process of law whereby a third party acquires rights to the operation, ownership or assets of Dealer.

12.6 Failure of Performance by Dealer. If Dealer has failed to adequately perform its sales or service responsibilities, including those responsibilities relating to customer satisfaction and training, Workhorse will review such failure with Dealer. As soon as practicable thereafter, Workhorse will notify Dealer in writing of the nature of Dealer's failure and of the period of time (which shall not be less than 60 days) during which Dealer will have the opportunity to correct the failure. If Dealer does correct the failure by the expiration of the period, Workhorse will so advise the Dealer in writing. If, however, Dealer does not correct the failure by the expiration of the period, Workhorse may terminate this Agreement by giving Dealer 60 days advance written notice.

12.7 By Dealer. Dealer has the right to terminate this Agreement without cause at any time upon written notice to Workhorse. Termination by Dealer pursuant to this Section will be effective 90 days after Workhorse's receipt of the notice, unless otherwise mutually agreed in writing.

12.8 By Agreement. This Agreement may be terminated at any time by written agreement between Workhorse and Dealer.

12.9 Failure to be Licensed. If Dealer fails to maintain any license required for the performance of obligations under this Agreement or such license is suspended or revoked, Workhorse may immediately terminate this Agreement by giving Dealer written notice.

12.10 Incapacity of Dealer Operator. Because this is a personal services agreement, Workhorse may terminate this Agreement by written notice to Dealer if Dealer Operator is so physically or mentally incapacitated that the Dealer Operator is unable to actively exercise full managerial authority. Dealer's incapacity shall be determined by Workhorse in its good faith judgment. The effective date of termination will be stated in such written notice and will be not less than three months after receipt of such notice.

12.11 Reliance on Any Applicable Termination Provision. The terminating party may select the provision under which it elects to terminate without reference in its notice to any other provision that may also be applicable. The terminating party subsequently also may assert other grounds for termination. Termination shall not be a party's exclusive remedy or constitute a waiver of any other remedy.

12.12 Transactions After Expiration or Termination.

12.12.1 Effect on Orders. If Dealer and Workhorse do not enter into a successor Authorized Dealer Agreement when this Agreement expires or is terminated, all of Dealer's outstanding orders for Workhorse Products will be automatically cancelled. Expiration or termination of this Agreement will not release Dealer or Workhorse from the obligation to pay any amounts owing the other, nor release Dealer from the obligation to pay for any Workhorse Product if Workhorse has begun processing such orders prior to the effective date of termination.

12.12.2 Effect of Transactions After Termination. Neither the sale of Workhorse Products to Dealer nor any other act by Workhorse or Dealer after termination of this Agreement will be construed as a waiver of the termination.

12.13 Return of Property. Upon termination or expiration, Dealer shall return all materials bearing the Marks, any software provided by Workhorse, the Service Policies and Procedures Manual, price lists, Workhorse Product lists and any other proprietary or Confidential Information of Workhorse.

EXHIBIT F

STATE OF RHODE ISLAND SUPERIOR COURT
PROVIDENCE, S.C.

ANDCO, INC. d/b/a ANDERSON MOTORS,
Plaintiff.

VS. P.C. No.: 07-2332

WORKHORSE CUSTOM CHASSIS, LLC and
WORKHORSE SALES CORP.,
Defendants.

**AFFIDAVIT OF JOHN E. ANDERSON, JR. IN SUPPORT OF PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF**

I, John E. Anderson, Jr., on oath, hereby depose and state as follows:

1. I submit this Affidavit, based on personal knowledge, in support of the Plaintiff's Request for Injunctive Relief in the within matter.

2. In 1964, my father, John Anderson, Sr., established ANDCO, Inc. ("ANDCO"), a corporation organized and existing pursuant to the laws of the State of Rhode Island. Since 1983, ANDCO has done business under a d/b/a, "Anderson Motors," which is a highly successful, family-run truck dealership in Rhode Island. My father, my brothers James and Jeffrey Anderson, and I are all involved in the operation of the dealership, and we all take great pride in the dealership's success and in the name of "Anderson Motors."

3. Currently, ANDCO sells and services new Volvo and GMC Trucks, Workhorse Vans, and Fleetway Trailers & Truck Bodies. My father is the Dealer Principal for all of these manufacturers. My father (John Anderson, Sr.) and my mother

(Judith Anderson) currently own the ANDCO dealership, and my father and I, together with my brothers James and Jeffrey, currently operate the ANDCO dealership.

4. ANDCO was a dealer for many years for the GMC truck line called the "P-series" trucks.

5. A number of years ago, upon information and belief, Workhorse Custom Chassis, LLC ("Workhorse") directly or indirectly acquired the GMC product line known as the so-called "P-series" trucks.

6. For many years, ANDCO has served without incident as a franchised licensed dealer in Rhode Island for Workhorse trucks.

7. In the beginning of February 2007, ANDCO received a letter (the "Termination Notice" from Bill Beach, Director of Dealer Operations for Workhorse, purporting to terminate ANDCO's Workhorse truck franchise as of May 5, 2007, based on an alleged violation by ANDCO of Section 8.4.6 of the Dealer Agreement between ANDCO and Workhorse (a copy of the Termination Notice is attached hereto as Exhibit 1).

8. ANDCO has never been advised of the details of the alleged violation by ANDCO of Section 8.4.6 of the Dealer Agreement between ANDCO and Workhorse, other than a vague reference by Bill Beach of Workhorse in a telephone call from me after ANDCO received the Termination Notice, that he wasn't sure why he was ordered to send the Termination Notice, other than he thought the alleged violation concerned my personal business involvement (along with my brothers) in an International/Navistar

truck franchise in Massachusetts, and he confirmed to me that the alleged conduct did not directly involve the Workhorse franchise.

9. My involvement in an International/Navistar truck franchise in Massachusetts, along with my brothers' involvement, was in our individual capacities and/or corporate capacities not related to ANDCO, and ANDCO has never been a party to any agreements or business relationships related to the International/Navistar truck franchise in Massachusetts.

10. My father, John Anderson, Sr., who is the "Dealer Principal" under ANDCO's Workhorse truck franchise agreement, has never been a party to any written agreement related to the International/Navistar truck franchise in Massachusetts.

11. Upon information and belief, Workhorse is attempting to terminate ANDCO's Workhorse franchise based on alleged conduct by persons other than ANDCO or its Dealer Principal, and based on alleged conduct not directly related to ANDCO's Workhorse truck franchise in Rhode Island.

12. I believe that the alleged conduct in Massachusetts by me and my brothers would not constitute a violation of the Workhorse franchise agreement even if the conduct was conducted by or attributable to ANDCO, and certainly not when in fact that conduct was not conducted by or attributable to ANDCO. The conduct in question is summarized below.

13. International Truck and Engine Corporation ("ITEC") is a manufacturer and distributor of trucks and engines under the trade names "International" and "Navistar".

14. Upon information and belief, ITEC is owned by the same parent company or holding company that owns Workhorse.

15. In April 2004, at an ATD ("American Truck Dealer Association") Convention, I met Dennis Wise ("Mr. Wise"), ITEC's Vice President of Dealer Operations. Mr. Wise informed me that ITEC had problems in the Greater Boston Market and was looking for an experienced dealer with relevant market experience to acquire the ITEC dealerships there. Mr. Wise told me that he would be in touch with me to schedule an initial interview with ITEC executives.

16. Thereafter, an ITEC representative contacted me to schedule an initial interview with ITEC executives for June 24, 2004 at the Squantum Club in East Providence, Rhode Island. In addition to Mr. Wise, other ITEC representatives at this meeting included John W. Whitnell (Mr. Whitnell"), ITEC's Director of Dealer Operations; Steven Mroczkowski ("Mr. Mroczkowski"), ITEC's Director of Dealer Operations for the East and Canada; and Daniel Murphy ("Mr. Murphy"), the Executive Vice President and Chief Financial Officer for Ideal Lease, an ITEC subsidiary. At this meeting, Mr. Wise stated that based on our reputation, experience, knowledge, and other industry-related capabilities, ITEC was interested in the possibility of having us become the dealer at an existing ITEC truck dealership located at 340 Mystic Avenue, Medford, Massachusetts (the "Medford Point"), which ITEC was in the process of acquiring from International Truck Center of Boston ("ITCOB"). Mr. Wise then explained that ITEC, after purchasing the Medford Point, planned to acquire the surrounding points, and that whoever was appointed for the Medford Point would become the ITEC dealer at the

surrounding points as well. We told Mr. Wise and the other ITEC executives at the meeting that we were very interested in becoming the ITEC dealer for the Medford Point initially, and then for the Greater Boston Market in the future as ITEC accomplished these acquisitions.

17. During this interview, Mr. Wise and the other ITEC executives further described ITEC's current business strategy of purchasing several international truck dealerships for common ownership in a given market. The ITEC representatives, including Mr. Wise, explained that ITEC's current dealer strategy throughout the country, which they were already implementing in several markets (e.g., in St. Louis, Chicago and Texas, among other locations) was to consolidate dealership ownership under a common owner in a designated market, and that we could be such a dealer for the Greater Boston Market.

18. In late August 2004, my brothers and I (but not my father, John Anderson, Sr., the Dealer Principal of ANDCO), and ITEC, entered into an agreement entitled "Agreement in Principal," whereby we agreed, among other things, that "… the Anderson's (sic) will become International's dealer for the trade area currently assigned to ITCOB." The Agreement in Principal contemplated execution of a Definitive Agreement within 90 days, and provided that in the interim period between the ITCOB closing and the execution of a Definitive Agreement, ITEC would execute a document referred to as a "Management Agreement" with the Andersons, and that ITEC would "remunerate the Anderson's with a fee equivalent to $20,000.00 per month (or $666.67 per day on a pro-rata basis)." This "Management Agreement" was intended to be very

short term, and both parties agreed "to define the specific business arrangement to be structured and legally formalized in the Definitive Agreement." The Agreement in Principal concluded with the following statement: "Finally, and perhaps most importantly, both parties agree to fully support the Anderson's vision of becoming customers' dealership of choice for truck transportation service first in the Greater Boston market and growing throughout the New England region."

19. We had discussions with Mr. Wise and others at ITEC about the language in the Agreement in Principal that provided that we would enter into a *Management* Agreement with ITEC. The Andersons had no intention of being "managers," and ITEC was fully aware of this fact. We explained to Mr. Wise and others at ITEC that we were dealers and not a "management company"; rather, our sole interest was in becoming the ITEC dealer for the Medford Point, as we had orally agreed upon (we have never served as a management company and have always been a dealer). Mr. Wise and others at ITEC assured us that this agreement was only an interim measure and was needed as a way of compensating us initially while ITEC finalized various post-closing obligations with ITCOB. ITEC further assured us that, notwithstanding this terminology, we would be operating as the new ITEC dealer from the outset and not as a "manager." ITEC further assured us that after being appointed the ITEC dealer for the Medford Point, we would then be appointed the ITEC dealer at the previously designated ITEC dealerships that ITEC was in the process of acquiring in the Greater Boston Market.

20. At some point prior to August 2004, ITEC organized a Delaware corporation called "Patriot International Trucks, LLC" ("Patriot"), which, ITEC

represented to us, it had incorporated for the purpose of purchasing all of ITCOB's assets and its dealership sales agreement, as well as any future international dealerships it acquired in the Greater Boston Market. It was our understanding that Patriot was to operate as a "holding company," and had none of its own employees. Upon information and belief, Patriot was and remains today a wholly-owned subsidiary of ITEC.

21. On September 1, 2004, my brothers, James and Jeffrey, and I began acting as the dealer at the Medford Point. On this day, Mr. Mroczkowski read a statement to all of the ITCOB employees in Medford, which, upon information and belief, had been prepared and signed by Mr. Wise. Two ITEC employees were also present when Mr. Mroczkowski read this statement: Ray Klabunde, an Operations Manager, and Scott Finley, a Business Manager. The statement stated in part:

> International Truck and Engine Corporation is pleased to announce that an Agreement in Principal has been reached with the Anderson Motors Group to acquire International Truck Center of Boston and move forward as International's new dealer ownership group for this assigned market area. International is extremely proud and fortunate to welcome the Andersons to our dealer network.

This statement was completely consistent with the oral dealership agreement we had reached with ITEC: we were becoming the new ITEC dealer for the Medford Point and my brothers and I had joined the ITEC dealer network as dealers.

22. ITEC assured to us that as of September 1, 2004, we would be the ITEC dealers at the Medford Point but that it needed to finalize certain post-closing matters with Mr. Fenn over the next 90 days. Later, Paul Kovach ("Mr. Kovach"), ITEC's Manager of Business Development and Dealer Operations, told us that the post-closing matters would take longer than 90 days to settle and might actually take as long as six

months. During this timeframe, while ITEC attended to various post-closing matters with Mr. Fenn, we were instructed to operate the dealership in the name of Patriot International Trucks, LLC, but were assured by Mr. Wise, Mr. Kovach and others that we had been appointed the dealer at the Medford Point as of September 1, 2004.

23. In or around February 2005, Mr. Wise and other ITEC representatives authorized and instructed us to operate the Medford Point under the name "Anderson International Trucks of Boston," which we proceeded to do. With ITEC's authorization, the Anderson name was prominently displayed to the public, and we were held out as being the new ITEC dealer for the Medford Point. For example, the dealership letterhead and signage inside the facility were changed to reflect our ownership of the dealership - - displaying prominently the name, "Anderson International Trucks of Boston." The sides of the dealership's parts and service trucks were painted to display the Anderson International Trucks of Boston name. In addition, the mud flaps and decals on the trucks sold at the dealership all displayed the Anderson dealership name. New uniforms were issued to the mechanics at the dealership with the Anderson International Trucks emblem.

24. Over the next two years, ITEC continuously treated us and held us out to the public, and the management, employees and Board of Directors of ITEC, as the ITEC dealer for the Medford Point. For example, in October 2004, ITEC invited us to attend the International Truck Dealer Meeting in Atlanta, Georgia. At that meeting, which, upon information and belief was videotaped, Mr. Johanneson introduced us to the

International Truck Dealer Network, as well as other ITEC executives, as the new ITEC dealer in Boston, Massachusetts and welcomed us to their family as dealers.

25. ITEC continued to treat us as the dealer for the Medford Point and was treating me as the "Dealer Principal." In this regard, Mr. Kovach instructed me to sign dealership documentation issued by ITEC's legal department as "President" of Patriot in or around August 2005. In doing so, he told me that Massachusetts law precluded ITEC from owning a dealership for more than one year after its purchase of ITCOB and reiterated that the Anderson family was in fact the "dealer" and hence owner of the dealership at this location. At this same time, Mr. Kovach instructed me to sign, as "President of Patriot International LLC," an "Associate Dealer Agreement" concerning SAV Transportation in Wareham, Massachusetts, which was prepared by ITEC, as well as a Trademark License Agreement.

26. Shortly thereafter, in September 2005, ITEC sent me a contract entitled "Dealer Inventory Alliance/GPRP," which was addressed to "Patriot/Anderson International" and instructed me to sign as "customer/dealer."

27. On November 14, 2005, ITEC sent me a document entitled "Dealer Business Objectives – FY 2006," and requested that I sign the third page of the document, which is entitled "2006-2007 Dealer Heavy Business Commitment Form," as "Dealer Principal," which I proceeded to do and return to ITEC.

28. During this same period of time, the Andersons were attending various ITEC dealer meetings, and, at these meetings, ITEC representatives held the Andersons out to the various ITEC dealers as the ITEC dealer for the Medford Point.

29. In December 2005, Mr. Kovach instructed us, as the dealer for the Medford Point, to become signatories on Patriot's Operating Account at Century Bank and sign all dealership checks. In addition, Mr. Kovach instructed the Andersons to order new checks in the name of "Anderson International Trucks of Boston," which we proceeded to do. James, Jason L. Raposa (Anderson Motors' former Controller who then served as the Operations Manager at the Medford Point), Louis Larisa (Anderson Motors' CFO), and I were all added as signatories to the account. In addition, and at ITEC's directive, I personally signed the Back-up Withholding Certifications on the account.

30. In or around this same period of time, Mr. Kovach gave me a document entitled "General Management Agreement," which I was instructed to, and did in fact, sign. I told Mr. Kovach that I did not want to sign this document because, as he was well aware, we were not and had never been a "management company," and had always been the dealer at the Medford Point. Mr. Kovach told me that ITEC was requiring me to sign this document "as a formality" to ensure continued payment of the monthly fee ITEC was paying us. Mr. Kovach further assured me that no one at ITEC had ever considered us to be "management" and that, by signing this document, I was not in any way changing or jeopardizing the fact that the Andersons had been appointed the dealer for the Medford Point and were not "managers." Based on Mr. Kovach's representations to me, I agreed to sign the document. If I believed that signing this document would in any way affect the fact that my family had been awarded the Medford Point and had been appointed the ITEC dealer for that location, I never would have signed the document. I was never given a fully executed copy of this document and never knew if anyone from ITEC ever

even signed it. Mr. Kovach also orally agreed to increase the monthly fee that ITEC was paying us to $25,000.00 -- an amount that did not come close to compensating us for our efforts. In or around that same period of time, I also spoke with Mr. Wise who further assured me, as he had done repeatedly in the past, that we were the ITEC dealer at the Medford Point, that a formal written dealership agreement would be forthcoming, and that I had nothing to be concerned about.

31. We always understood, based on ITEC's representations to us, that we would execute a formal written dealer agreement with ITEC. Mr. Wise and others at ITEC repeatedly informed us that they were working on the agreement and that it would be coming soon. They also assured us that our rights were in no way prejudiced by the lack of a formal written agreement since we were operating at all times relevant hereto pursuant to an oral dealership agreement. We understood that the measures ITEC had implemented, which included, among other things, holding us out to everyone as the ITEC "dealer" for the Medford Point, representing that I was the "Dealer Principal" and "President" of Patriot, and making us signatories on the Century Bank operating account, were sufficient trust factors to protect our interests under our oral dealership agreement until a formal written agreement was executed.

32. On October 2, 2006, Mr. Kovach called me on my cell phone to request a meeting with my brother James and me the very next day at the Medford dealership. The meeting took place on October 3, 2006. ITEC representatives in attendance included Mr. Whitnell and Mr. Kovach, as well as a woman named Aida Tanaka. Ray Klabunde was also at the premises. In addition to my brother James and me, our CFO, Louis Larisa, was

there as well. Ms. Tanaka gave us a business card which stated that she was ITEC's Associate General Counsel. At this meeting, Mr. Whitnell suddenly informed us that ITEC no longer wanted to go forward with our agreement; that ITEC was in bad financial shape as a corporation; and that ITEC was essentially terminating the relationship. Mr. Whitnell acknowledged that ITEC was breaking its dealership agreement with us and made a statement to the effect of, "Our breaking this agreement will not look good amongst other dealers." We informed the ITEC representatives that we were committed to our agreement and intended to remain the dealer at the Medford Point, which was starting to show a profit. We also pointed out to Mr. Kovach that he lied to us in the summer of 2006 when he repeatedly assured us that our formal written dealership agreement would be sent to us shortly after ITEC's lawyers finished their review. Mr. Kovach shook his head in acknowledgement. The discussion became very heated, and, after about two and one half hours, we agreed to break for the day. We were completely shocked by ITEC's statement as we had no forewarning that ITEC was even considering breaking its agreement with us.

33. From my work at the Medford Point, and as a signatory on the Operating Account, I understood that the Operating Account had a balance on October 3, 2006, of slightly over $1,100,000.00. ITEC's comments about the decision to pull the plug on the dealership caused me to have great concern about the welfare of the dealership, and the monies that the Andersons, through two years of dedication, were able to accumulate in the operating account.

34. In order to protect the dealership funds, I immediately wrote a check made payable to "Anderson Motors, Inc." from the Century Bank operating account and deposited these funds into an Anderson Motors, Inc. account with the memo line stating, "Escrow Acct." Immediately thereafter, I contacted my local Rhode Island attorney, Jack McGreen of Taft and McSally, gave him a bank check in the amount of $1,100,000.00, and instructed him to create an "escrow account" for those monies while we tried to resolve our dispute with ITEC.

35. The very next day, October 4, 2006, James and I received a telephone call from James Raposa, our Operations Manager for the Medford Point, who informed us that ITEC had locked us out of the dealership, changed the locks at the gate, hired security personnel who were instructed to prevent us from entering the dealership, and manipulated ADP (the dealership's computer services provider) to shut down our <u>entire</u> ADP system, which included not only access to ITEC's System 21 computer system but also to our <u>own</u> computer system for our Rhode Island dealership. From that point forward, ITEC has completely denied us access to the Massachusetts dealership.

36. This denial of access has included our right to access any and all business records of the dealership, including bank account statements, financial records and the like. These records demonstrate that, from the date of our appointment as the ITEC dealer for the Medford Point, we were able to accrue at least $1.1 million in working capital as the direct result of our operation of the dealership. These documents will also show that the monies that ITEC had infused into Patriot were never able to serve as working capital. Upon information and belief, the documents will show that the $1.1

million is money that was generated by the Andersons in connection with our operation of our dealership and, therefore, rightfully belongs to the Andersons.

37. In or around this same period of time, I made a phone call to Michael Jarrick, ITEC's general counsel, by cell phone, to let him know that ITEC had breached the dealership agreement with us and that I had placed the dealership's working capital into an escrow account. Mr. Jarrick said that he did not know what was going on, that he was traveling that week, that he would set up a time to meet with me, and that he would call me back to schedule the meeting. I never heard back from him.

38. When I withdrew the money from the Century Bank account, I did so understanding that these funds belong to the Andersons, and not to Patriot. My intention was to have that money held in escrow pending the resolution of our dispute with ITEC. I had no intention, and never had any intention, of taking that money for myself individually.

39. My brother and I (not my father, John Anderson, Sr., who is ANDCO's Dealer Principal), are parties to litigation brought by Patriot International Trucks, LLC (a Delware entity formed by ITECH) in Massachusetts in connection with the business dealings described above, with the litigation being titled "Patriot International Trucks, LLC vs. John E. Anderson, Jr., James E. Anderson, and ANDCO, Inc. d/b/a Anderson Motors, Inc.", which is Civil Action No. 06-3850 in Middlesex Superior Court in the Commonwealth of Massachusetts. My brother and I deny the substantive allegations of ITEC's related entity in that litigation, and we are vigorously defending that litigation.

40. I am aware of no other possible factual basis for an alleged breach by ANDCO of the Workhorse franchise agreement, other than the general factual background outlined above, which factual background clearly shows that neither ANDCO nor its Dealer Principal engaged in any conduct vis-à-vis Workhorse which should serve as a basis for a termination of its Workhorse franchise agreement.

John E. Anderson, Jr.

STATE OF RHODE ISLAND
COUNTY OF PROVIDENCE

SUBSCRIBED AND SWORN TO before me this 7th day of May, 2007.

Notary Public

My Commission Expires: 6/24/09

JOSHUA TEVEROW, ESQ.
NOTARY PUBLIC
MY COMMISSION EXPIRES JUNE 24, 2009

**EXHIBIT 1**

February 1, 2007

Mr. John E. Anderson
Anderson Motors
170 Amaral Street
East Providence, Rhode Island 02915

Re: ***Authorized Dealer Agreement dated May 1, 1999***

Dear Mr. Anderson:

This letter is being sent pursuant to Section12.1 of the Authorized Dealer Agreement and in accordance with Rhode Island Motor Vehicle Act Section 31-5.1-4 (d)(5).

Please be advised that Workhorse Custom Chassis, LLC will not renew the Dealer Agreement as of May 5, 2007. The reason for the non-renewal is violation of Section 8.4.6 of the Dealer Agreement. This termination will take effect on May 7, 2007. We will be in contact with you prior to that date to discuss any termination issues that need to be addressed. In the meantime, please do not hesitate to contact the undersigned if you have any questions.

Sincerely,

**Workhorse Custom Chassis, LLC.**

Bill Beach
Director of Dealer Operations

*104 Saratoga Court*
*Nicholasville, Kentucky 40356*
*Direct: 859-312-7827*
*Fax: 859-887-4210*
*Electronic: bbeach@workhorse.com*

STATE OF RHODE ISLAND
PROVIDENCE, S.C.

SUPERIOR COURT

ANDCO, INC. d/b/a ANDERSON MOTORS,
Plaintiff,

VS.

P.C. No.: 07-2332

WORKHORSE CUSTOM CHASSIS, LLC and
WORKHORSE SALES CORP.,
Defendants.

**MOTION FOR TEMPORARY RESTRAINING ORDER**

Now comes the Plaintiff, ANDCO, Inc. d/b/a Anderson Motors ("ANDCO"), and hereby requests that the Court issue a Temporary Restraining Order restraining and enjoining Defendant Workhorse Custom Chassis, LLC ("Workhorse") from terminating ANDCO's Workhorse truck franchise pending a preliminary injunction hearing.

ANDCO, INC. d/b/a ANDERSON
MOTORS,
By its attorney,

Joshua Teverow, Esquire (#2132)
Joshua Teverow, Esquire, Ltd.
55 Pine Street
Providence, Rhode Island 02903
401-272-2900 (Phone)
401-331-2656 (Fax)

**CERTIFICATE OF SERVICE**

I, Jessica Romeiro, hereby certify that on this 7th day of May, 2007, I served a copy of the foregoing document by facsimile (312-460-7000) on Michael Levinson, Esquire, Seyfarth Shaw, LLP, 131 South Dearborn Street, Suite 2400, Chicago, Illinois 60603-5577.

STATE OF RHODE ISLAND
PROVIDENCE, S.C.

SUPERIOR COURT

ANDCO, INC. d/b/a ANDERSON MOTORS,
Plaintiff,

VS.

P.C. No.: 07-2332

WORKHORSE CUSTOM CHASSIS, LLC and
WORKHORSE SALES CORP.,
Defendants.

**MOTION TO TAKE DEPOSITION PRIOR TO ANSWER**

Now comes the Plaintiff, ANDCO, Inc. d/b/a Anderson Motors ("ANDCO"), and hereby requests that the Court allow ANDCO to take the deposition of Bill Beach (the "Deponent"), Director of Dealer Operations for the Defendant Workhorse Custom Chassis, LLC ("Workhorse"). In support of the within Motion, ANDCO states as follows:

1. The Deponent sent a franchise termination notice (the "Termination Agreement") on behalf of Workhorse to ANDCO, which Termination Notice is the subject of the within Complaint.

2. The Termination Notice does not state the factual basis for the termination, and simply references an alleged violation of Section 8.4.6 of the relevant franchise agreement between ANDCO and Workhorse, which Section states that the dealer agrees not to "… engage in any illegal, deceptive, misleading, or unethical practices…".

3. ANDCO cannot adequately pursue its rights in connection with the termination of its Workhorse franchise unless it is able to learn from the

Deponent the detailed factual basis for the Termination Notice sent by the Deponent on behalf of Workhorse to ANDCO.

4. It would not be sufficient for Workhorse to simply list the factual basis for the Termination Notice at this time by documents or communications prepared by and/or reviewed by Workhorse's legal counsel, since ANDCO needs to know exactly what factual information the Deponent was personally aware of that would justify the Termination Notice at the time the Deponent sent the Termination Notice on behalf of Workhorse to ANDCO, especially because ANDCO believes that the Deponent will testify that the basis for the Termination Notice did not emanate from Workhorse itself, but instead from ITEC through Workhorse's and ITEC's parent company (see Complaint and accompanying Affidavit for factual background regarding ITEC).

5. The prompt taking of the Deponent's deposition will cause no significant harm or inconvenience to Workhorse, and it is in the interests of the efficient administration of justice, especially in light of the obvious irreparable injury that will be suffered by ANDCO if it does not obtain injunctive relief restraining the imminent threatened termination of ANDCO's Workhorse truck franchise.

WHEREFORE, ANDCO respectfully requests this Court order Workhorse to produce the Deponent for a deposition in Rhode Island as soon as

reasonably possible, but not later than one (1) week from the date this Motion is heard.

ANDCO, INC. d/b/a ANDERSON MOTORS,
By its attorney,

Joshua Teverow, Esquire (#2132)
Joshua Teverow, Esquire, Ltd.
55 Pine Street
Providence, Rhode Island 02903
401-272-2900 (Phone)
401-331-2656 (Fax)

**CERTIFICATE OF SERVICE**

I, Jessica Romeiro, hereby certify that on this 7th day of May, 2007, I served a copy of the foregoing document by facsimile (312-460-7000) on Michael Levinson, Esquire, Seyfarth Shaw, LLP, 131 South Dearborn Street, Suite 2400, Chicago, Illinois 60603-5577.