**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| ANDCO, INC. d/b/a ANDERSON MOTORS, | : | |
| Plaintiff, | : | |
| v. | : | C.A. No.: 07-cv-159 |
| WORKHORSE CUSTOM CHASSIS, LLC and WORKHORSE SALES CORP., | : | |
| Defendants. | : | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

## BACKGROUND

A. The Parties

Workhorse Custom Chassis, LLC ("Workhorse") manufactures motor home and commercial chassis and distributes those products through various means, including through a network of authorized dealers. Workhorse is wholly-owned by a subsidiary of International Truck and Engine Corporation ("ITEC'), which manufactures and sells trucks and truck parts, also through a network of authorized dealers.

Anderson Motors, Incorporated ("ANDCO") is a highly-successful, multi-line motor vehicle dealer located in Providence and is owned and operated by members of the Anderson family -- John, Sr., John, Jr., James and Jeffrey. (Anderson Aff. ¶ 2). ANDCO sells and services Volvo, GMC, Autocar Trucks, Fleetway Trailers and Truck bodies, a variety of accessory products and equipment, such as plows and tarping systems, and Workhorse products.

In 2006, ANDCO's total sales of Workhorse products were approximately $58,000. (William D. Beach Aff., attached as Exhibit A). Through April 30 of this year, ANDCO has sold approximately $3,800 of Workhorse products. (Ex. A). In contrast, ANDCO's website indicates

that ANDCO is the "#1 heavy truck sales leader in our region" and that "we sold more Volvo/GMC Autocar trucks than any other dealer in our region." (www.andersonmotors.com).

B. Workhorse Authorized Dealer Agreement

ANDCO became a Workhorse dealer as of May 1, 1999, pursuant to an Authorized Dealer Agreement ("Agreement"). (*See* Agreement, relevant portions attached as Ex. B). The Agreement authorizes ANDCO to sell Workhorse products on a non-exclusive basis from its Providence location and in an area of primary responsibility consisting of Rhode Island, Connecticut and certain counties in Massachusetts. Workhorse entered into the Agreement in specific "reliance on the qualifications of" John, Sr., who signed on behalf of ANDCO (Ex. B, ¶ 3.1). The Agreement further provides:

> This is a personal services agreement entered into in reliance on the qualifications of the person designated by Dealer to operate the business . . . and on Dealer's assurance that Dealer operator will provide personal services by exercising full managerial authority over dealership operations.

(Ex. B, ¶ 3.2).

The Agreement specifies the parties' obligations. The Agreement also lists six (6) "prohibited activities" which ANDCO agreed not to engage in, including "any illegal, deceptive, misleading or unethical practices." (Ex. B, ¶ 8.4.6). The Agreement had an initial term of one (1) year, which automatically renewed for successive, one-year periods, unless either party gave appropriate notice of non-renewal.

C. Workhorse's Non-Renewal of the Agreement

By letter dated February 1, 2007, Workhorse gave ANDCO notice of non-renewal of the Agreement, effective May 5, 2007. The notice was based on ANDCO's violation of the Agreement's prohibition in ¶ 8.4.6 on "any illegal, deceptive, misleading or unethical practices." In separate conversations with ANDCO's counsel, Workhorse counsel's identified and explained

the violations of ¶ 8.4.6 that led to non-renewal of the Agreement. (Michael R. Levinson Aff., Ex. C). At the request of ANDCO's counsel, Workhorse extended the non-renewal date to May 11, 2007.

D. ANDCO's Illegal, Deceptive, Misleading and/or Unethical Practices

The illegal, deceptive, misleading or unethical practices that form the basis for Workhorse's non-renewal of the Agreement arose out of the theft of $1.1 million and other activities in connection with an ITEC-created and owned dealership located in Medford, Massachusetts, known as Patriot International Trucks, LLC ("Patriot"). ITEC owns and has always owned Patriot and neither ANDCO nor the Andersons has or has ever had any ownership interest in Patriot. (Anderson Aff. ¶ 20).

Pursuant to a written General Management Agreement dated December 1, 2005, Patriot appointed John, Jr. as General Manager of Patriot. (Anderson Aff. ¶ 30). The General Management Agreement provided that John, Jr. would conduct Patriot's business as directed by Patriot's Board of Directors. (General Management Agreement, ¶ 1, relevant portions attached as Ex. D). The General Management Agreement also provided that:

> Manager shall not use any of the funds of the Dealership for his own use and shall not take from the Dealership, or cause to be paid for his benefit, any of the funds of Dealership and shall not accept or take as compensation for services any sum whatsoever except such compensation as is provided in this Agreement or authorized by resolution by the Board of Directors.

(Ex. D, ¶ 3). The sole compensation ever provided by the General Management Agreement or authorized by Patriot's Board was $20,000 per month, later increased to $25,000 per month. (Ex. D, ¶ 2). The General Management Agreement provided that this "monthly fee will be paid to Anderson Motors." (Ex. D, ¶ 2).

Late in the afternoon on October 3, 2006, ITEC terminated the General Management Agreement and revoked John, Jr.'s authority to operate the dealership, including his and his brothers' authority to access Patriot's bank accounts. (Anderson Aff. ¶ 32). Nonetheless, later that day, John, Jr. wrote a check on Patriot's operating account at Century Bank in Medford for $1.1 million, made payable to ANDCO. (Anderson Aff. ¶ 34). John Jr. then deposited that check in an ANDCO account. (Anderson Aff. ¶ 34). After that check cleared, ANDCO, through John, Jr., wrote a check on ANDCO's account for $1.1 million and made payable to ANDCO's attorney. (Anderson Aff. ¶ 34).

E. The Massachusetts Litigation

Patriot filed suit in the Superior Court of Middlesex County, Massachusetts against John, Jr., James, and ANDCO for a variety of claims, seeking, among other things, return of Patriot's $1.1 million, return of Patriot property held by defendants and an order prohibiting defendants from representing to third-parties that they owned or controlled Patriot. John, Jr., James and ANDCO filed counterclaims against Patriot and third-party claims against ITEC, various current and former employees of ITEC, and the board of directors of ITEC's publicly-traded parent company, Navistar International. ANDCO and the Andersons claimed, among other things, that the Andersons were the dealer, that they owned the $1.1 million and other property, and that Patriot and the other counter-defendant damaged them in the amount of $99,840,000.00.

On November 30, 2006, Judge Isaac Borenstein granted Patriot's motion for preliminary injunction, denied defendant's motion for preliminary injunction and ordered John, Jr., James, and ANDCO, among other things, to place the $1.1 million they had taken in an independent escrow account. Judge Borenstein held that Patriot:

> . . . is substantially likely to show that it retains possession of Patriot, and therefore to prevail on the merits of its claim for recovery of the funds and items taken from the dealership. The

> Andersons are not substantially likely to prevail in their claim for wrongful termination under G.L. 93B § 5.

(Borenstein's Memorandum of Decision and Order, relevant portions attached as Ex. E).

## ARGUMENT

ANDCO does not face irreparable injury because Workhorse is only one of many lines ANDCO carries and its Workhorse sales are *de minimus*. ANDCO cannot show that it is likely to succeed on the merits because Workhorse has "good cause" under the Rhode Island Dealers' Law, R.I.G.L. § 31-5.1-1 *et seq* (1956), not to renew the Agreement.

### A. <u>ANDCO Does Not Face Irreparable Injury</u>

This is not a case in which ANDCO faces having to close down, reduce its staff or take any other such dire action once it is no longer a Workhorse dealer. Workhorse is one, very small line that ANDCO carries. John E. Anderson, Jr. testified in his Affidavit that ANDCO is "highly successful." (Anderson Aff. ¶ 2). This success does not come from its sales of Workhorse products, which are *de minimus*. ANDCO has come forward with no evidence or argument on how or why the loss of this small amount of business can be irreparable.

Indeed, ANDCO's damages are readily calculable, based on its historic (*de minimus*) sales. *Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004) ("irreparable harm is a necessary threshold showing for awarding preliminary injunctive relief * * * Inasmuch as the plaintiff has failed to demonstrate a realistic prospect of irreparable harm, she has not crossed that threshold"); *accord, Foreign Motors, Inc. v. Audi of Am., Inc.*, 755 F. Supp. 30, 33-4 (D. Mass. 1991) (terminated Audi dealer did not face irreparable injury because it "will still be able to deal in three other lines").

B. ANDCO Is Not Likely To Succeed On The Merits

There is no question that Workhorse has the right under the Agreement not to renew the Agreement. Paragraph 8.6.4 prohibits ANDCO from "any illegal, deceptive, misleading or unethical practices" and paragraph 12.1 gives both parties the right not to renew the Agreement on 90 days' notice. The question on likelihood of success thus turns on whether Workhorse's non-renewal complies with the Dealers' Law.

The Dealers' Law provides that it is a violation for a manufacturer "to terminate, cancel or fail to renew" a dealership agreement unless the manufacturer has provided at least "ninety (90) days prior" notice, has good cause for the cancellation, termination or non-renewal" and has acted in good faith R.I.G.L. § 5.1.4(d), (2) (5).[1] Workhorse's non-renewal of the Agreement easily satisfies these requirements.

1. Notice

Workhorse delivered its notice of non-renewal on February 1, 2007, more than ninety (90) days prior to the May 5 effective date of the non-renewal. Though ANDCO challenges the notice as not specifying the grounds for non-renewal, that challenge fails. The Dealers' Law requires that the notice contain a statement of the manufacturers' intention not to renew, a statement of the reasons for non-renewal, and the date the non-renewal will take effect. R.I.G.L. § 5.1.4(d)(5)(ii). Workhorse's notice contained all three statements. Nothing in the Law says that the statement of reasons has to be anything more than a citation to the specific Agreement provision which the dealer breached, as Workhorse's notice provided. Indeed, Workhorse's notice provided sufficient information for ANDCO to take appropriate action to protect its position, just as it has done.

[1] The Law also requires that the manufacturer not have "committed any violations" set forth in subsection (b) of the Act. There is no allegation that Workhorse violated subsection (b).

In any event, ANDCO's counsel contacted Workhorse after receiving the February 1st notice and Workhorse's counsel advised on separate occasions that ANDCO's and the Anderson's conversion of $1.1 million was one of the illegal, deceptive, misleading and/or unethical practice identified in the notice. (Levinson Aff. ¶¶ 2-4). Workhorse's counsel explained that ANDCO's conversion of other Patriot property and interference with Patriot's operations were additional such practices. *Id.*

2. Good Cause

Good cause exists for termination, cancellation or non-renewal when:

> There is a failure by the new motor vehicle dealer to comply with a provision of the franchise which provision is both reasonable and of material significance to the franchise relationship, provided that the dealer has been notified in writing of the failure within one hundred eighty (180) days after the manufacturer first acquired knowledge of that failure. R.I.G.L. § 5.1-4(d)(3).

There is not a single published case in which a Rhode Island court has found that a manufacturer did not have good cause to terminate a motor vehicle franchise. On the contrary, the two leading cases have found good cause and upheld termination. *See Scuncio Motors, Inc. v. Subaru New England, Inc.*, 555 F. Supp. 1121, 1132 (1st Cir. 1982); *Dunne Leases Cars & Trucks, Inc.* v. *Kenworth Truck Co.*, 466 A.2d 1153, 1160 (R.I. S. Ct. 1983). In *Scuncio*, this Court held that Subaru had good cause for terminating a dealer which failed to relocate as it had agreed.[2] 555 F. Supp. at 1136-7. In *Dunne Leases*, the Rhode Island Supreme Court held that Kenworth had good cause for not renewing a dealer which breached an agreement to separate its leasing and sales operations. 466 A.2d at 1157-8.

[2] This Court denied Scuncio's request for a preliminary injunction against termination, notwithstanding the Court's finding that irreparable injury was "manifest," because Scuncio was a "one-brand dealer" which "will doubtless be forced out of business if the injunction is denied." *Scuncio*, 555 F. Supp. at 1125.

Workhorse easily meets the good cause standard. The Agreement's prohibition on illegal, deceptive, misleading, or unethical practices is both reasonable and material. Where personal service and trust are so important, a prohibition on illegal, deceptive, misleading or unethical practices is important and perfectly reasonable. *See Solomon v. Hall-Halbrooke Foundation, Inc.*, 1992 WL 3 1947, at *33 (Conn. Super. 1992) ("personal services contracts often require a relationship of cooperation and trust between the parties"); *Paper Products Mach. Co. v. Safepack Mills*, 239 Mass. 114, 123, 131 N.E. 288 (Mass. 1921) ("contract which involves personal services" is "one of trust and confidence"). Indeed, every Rhode Island contract carries an implied obligation of "good faith and fair dealing. *Bacou Dalloz USA, Inc. v. Cont'l Polymers, Inc.*, 344 F.3d 22, 28 (1st Cir. 2003). Thus, ANDCO's breach of a provision that goes to its very trust, integrity, and good faith in performing a personal services contract is both reasonable and material.[3]

ANDCO's assertion that it did not breach ¶ 8.4.6 is wrong.

First, the evidence is undisputed that ANDCO and the Andersons took $1.1 million from the operating account at Patriot, which they admittedly did not own. Through their attorney, they then tried to use that money as leverage against Patriot. This self-help remedy is illegal and unethical. *KPS & Assoc., Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 23 (1st Cir. 2003) ("self-help conduct of simply refusing to pay moneys due and owing is simply an inappropriate and inexcusable response"). If ANDCO and the Andersons honestly believed they had claims against Patriot, their recourse was to press their claims, not to steal Patriot's money and hold it

[3] After surveying motor vehicle dealer and similar laws of various states, the Supreme Court in *Dunne Leases* observed that "those states whose Legislatures have attempted to define the term 'just cause' or 'good cause' or 'due cause' within the contest of justification for nonrenewal of a franchise or dealership agreement have all agreed that such causes include substantial noncompliance with obligations in the agreement." 466 A.2d at 1158.

hostage. "It is no defense to conversion for a defendant to claim that he acted in good faith, reasonably believing that he had a legal right to possession of the goods." *Kelley v. LaForce*, 288 F.3d 1, 12 (1st Cir. 2002).

Second, the Massachusetts court has already found that Patriot, and not the Andersons, is likely to succeed on the merits of proving that ANDCO and the Andersons converted Patriot's money.

Third, there is no distinction between ANDCO and the Andersons under the Dealers' Law. R.I.G.L. § 31-5.1-1 (11) defines a "new motor vehicle dealer" as including "the individual officers, directors, and other persons in active control of the activities of that entity." That means the Andersons. As a result, ANDCO's allegation that the conversion of the $1.1 million was by "certain employees at ANDCO (but not ANDCO itself or ANDCO's dealer principal, John Anderson, Sr.)" is of no moment legally. (Ver. Cmplt., ¶ 22). Besides, the evidence shows that ANDCO was the one which received and then transferred Patriot's $1.1 million.

Fourth, since Workhorse's February 1, 2007 letter was a non-renewal, not a termination, it was not governed by paragraphs 12.3 or 12.4 of the Agreement, as ANDCO asserts, and Workhorse was not required to give any opportunity to cure. (Ver. Cmplt., ¶ 14). By their terms, paragraphs 12.3 and 12.4 govern Workhorse's right to *termination* mid-term, not *non-renewal* at the end of the Agreement's anniversary date. Paragraph 12.1 specifies Workhorse's right to serve a notice of non-renewal and it imposes no requirement of any opportunity to cure.

Fifth, the fact that ANDCO's and the Andersons' theft of the $1.1 million occurred four months prior to Workhorse's February 1 notice is irrelevant. (Ver. Cmplt., ¶¶ 24-25). The Dealers' Law requires that a manufacturer give notice "within one hundred eighty (180) days

after the manufacturer first acquired knowledge" of the dealer's failure to comply with a provision of the agreement and Workhorse obviously met that requirement. R.I.G.L. § 5.1-4(d)(3).

Sixth, ANDCO's belated argument (raised for the first time on the telephone on May 10) that the Dealers' Law requires a three-year minimum term, does not somehow invalidate Workhorse's non-renewal. Workhorse has been a dealer since 1999 -- eight years.

3. Good Faith

"Failure to exercise good faith will only be found in situations in which the manufacturer's actions are unfair or inequitable in addition to being coercive or intimidating." *Scuncio*, 555 F. Supp. at 1133. As this court held:

> . . . the Dealers' Law recognizes that a manufacturer should have the ability to insist upon compliance with its reasonable standard without subjecting itself to reflexive accusations of coercion or bad faith . . .

*Id.* at 1332-3. As a result, "if a manufacturer had good cause under the foregoing rubric for terminating a franchise agreement, and follows the provisions of the statute regarding notice, the manufacturer cannot, without more, be held to have acted in bad faith." *Id.* at 1132. Since Workhorse had good cause, it cannot be found to have acted in bad faith.

## CONCLUSION

Unable to show likelihood of success on the merits and in the absence of any evidence of irreparable injury, ANDCO's motion for a preliminary injunction should be denied.

Dated: May 14, 2007

Respectfully submitted,

WORKHORSE CUSTOM CHASSIS LLC
and WORKHORSE SALES CORP.

/s/ Geoffrey W. Millsom

Geoffrey W. Millsom (#6483)
James R. Oswald (#5727)
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903
(401) 274-7200
Fax: (401) 751-0604

Michael R. Levinson
Louis S. Chronowski
SEYFARTH SHAW LLP
131 S. Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000
Fax: (312) 460-7000

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Defendants' Memorandum In Opposition To Plaintiff's Motion For Temporary Restraining Order through the ECF system on the 14th day of May, 2007, and that notice will be sent electronically to all counsel who are registered participants identified on the Mailing Information for Case No. 07-00159-T-LDA and was sent by hand delivery to the following counsel of record:

| | |
|---|---|
| Joshua Teverow, Esq.<br>55 Pine Street<br>Providence, Rhode Island 02903 | |

/s/ Geoffrey W. Millsom